Raymond DOZIER, Plaintiff,

v.

Gary J. HILTON, Superintendent, New Jersey State Prison at Trenton; Peter Fenton, Superintendent at Rahway; William H. Fauver, Commissioner, New Jersey Department of Corrections; Elijah Tard, a former Acting Director of the Vroom Readjustment Unit; Joseph Call, Chairman, Inter-Institutional Classification Committee; and E. Calvin Neubert, Chairman, Special Classification Committee, Defendants.

Civ. A. No. 80–3771.

United States District Court,
D. New Jersey.

Feb. 10, 1981.

Alan Dexter Bowman, Princeton, N. J., for plaintiff.

Robert A. Shire, Deputy Atty. Gen., State of N. J., Trenton, N. J., for defendants.

## OPINION

DEBEVOISE, District Judge.

Plaintiff, Raymond Dozier, seeks an order requiring the New Jersey correction authorities to release him from protective custody

at the New Jersey State Prison at Trenton and to return him to the general population of any one of the State prisons. He asserts constitutional rights protected by 42 U.S.C. § 1983 and alleges jurisdiction under 28 U.S.C. § 1343(3) and (4).

Dozier, who is neither charged with nor being punished for any prison offense, has been given the choice of either transfer to an out-of-state prison or retention indefinitely in protective custody, where the isolation and the lack of work, recreational, visitation and educational opportunities approximate that endured by prisoners held in punitive confinement. Dozier has been given this choice notwithstanding the fact that there is available in New Jersey a maximum security prison to which, in the judgment of some of the prison authorities, Dozier could appropriately be transferred and placed in the general population.

This case raises the difficult question whether, in these circumstances, Dozier has a constitutional right to be transferred to the general population of a New Jersey prison rather than an out-of-state prison. This case also raises the question whether the failure to transfer Dozier to the general population of a New Jersey prison violates the provisions of a consent order and stipulation of agreement to which Dozier and the State were parties.

### I. *Procedural History*

Dozier filed his complaint on November 19, 1980, asserting his right to be transferred to the general population of a New Jersey prison and certain other rights not material to the present proceedings. The Court entered an order requiring defendants to show cause why Dozier should not forthwith be temporarily released from protective custody or otherwise housed under conditions approximating general population within a State correctional facility.

A hearing was held on December 1 and 15, 1980 and on January 5 and 9, 1981, at which extensive testimony of prison inmates and correctional officials was taken.

### II. *The Facts*

The testimony and exhibits received at the hearing establish the following facts:

In 1972, after being convicted for the commission of particularly brutal crimes, Dozier, who had a prior record of convictions and imprisonment, was sentenced to two consecutive life sentences and was sent to Trenton State Prison ("TSP"). TSP is the State's maximum security prison in which persons who have committed the most serious crimes and the most difficult prisoners in the prison system are usually confined. It consists of antiquated facilities (which are in the process of being replaced); its inmates are accorded less freedom of movement within the institution than is accorded inmates in other prisons; there are more guards per inmate than elsewhere.

After he had been in TSP for a short time Dozier was transferred to Rahway State Prison ("Rahway"), which is also a maximum security prison but which has more amenities than TSP, allows its inmates a greater freedom of movement, and has fewer guards per inmate. While at Rahway, Dozier became involved in a fight with an inmate. He was placed in solitary confinement for fifteen (15) days as punishment and then, on November 1, 1972, was transferred back to the general population of TSP.

Dozier remained in TSP's general population until February 21, 1974, at which time he was sent to the Vroom Readjustment Unit ("Vroom") as punishment for assaulting an inmate.

The Vroom Building represents the ultimate in security in the New Jersey prison system. It is used to house inmates being punished for serious prison offenses, and it is used to house inmates requiring protective custody. These inmates are confined to their cells except for daily showers and an exercise period in the prison yard for several hours two or three times a week in the winter and perhaps more often in the summer. No contact visits are permitted, the limited visiting which is allowed being through a thick glass window with a telephone for communication. There are no library or educational facilities. The conditions are substantially the same whether

one is confined in Vroom as punishment or for protective custody.

In February, 1975, while Dozier was still in Vroom, a suit was instituted which, according to the complaint, comprised:

> ... a constitutional challenge, under the due process, equal protection, right to counsel and cruel and unusual punishment clauses, to (a) arbitrary procedures for determining when an inmate is to be transferred to the R.U. [Vroom]; (b) the deprivation of virtually all freedom, rights of association, access to prison programs, and proper medical care and other necessities at the R.U.; (c) the arbitrary infliction of summary punishment in the form of physical brutality at the R.U.; and (d) the arbitrary methods in which it is determined whether inmates have 'readjusted' and can thus be released from the Readjustment Unit.

The plaintiffs in the suit, *Thomas Wooten v. Ann Klein*, Civil Action No. 75–179 ("*Wooten*"), were 58 of the 66 persons then confined in Vroom. Dozier was among them. They were represented in the action by the Office of the Public Advocate-Public Defender. Some of the plaintiffs (like Dozier) had been confined to Vroom for disciplinary reasons; some had been confined for protective custody. Among the latter were a number of inmates who had been charged with or convicted of the murder of Reverend Shabazz, about which more will be said later. Those involved in the Shabazz murder were placed in protective custody as soon as they entered the prison system.

The defendants in the *Wooten* action were the Commissioner of the Department of Institutions and Agencies, which was responsible for administering the State prisons, and a number of other departmental and prison officials.

On May 12, 1975, while the *Wooten* action was pending, Dozier was transferred back to the general population at TSP. A number of inmates who were confined in Vroom because of their conviction or alleged connection with the murder of Reverend Shabazz were also released from protective custody and sent to the general population at TSP prior to October, 1975.

In October of 1975 serious tension developed in TSP as a result of hostility between two Black Muslim religious groups, the New World of Islam and the Nation of Islam. A number of members of the New World of Islam were imprisoned at TSP for the murder of Reverend James Shabazz, a Newark minister of the Nation of Islam. Dozier was a member of the New World of Islam but his conviction and sentence were not for the murder of Reverend Shabazz.

On October 16, 1975 members of the New World of Islam (including many who had recently been released from Vroom) were assaulted by their rivals in a wild fracas in the prison's Donald Bourne School, during the course of which one person was killed and a number were wounded. Just prior to the attack Dozier had been in the Black studies office in the Bourne building. He heard a commotion in the hallway outside and, upon investigating, saw the melee and a member of his sect being attacked. While going to the man's aid Dozier himself was stabbed in the back.

Dozier's wound was not severe and, after receiving stitches at an outside hospital, he was returned to the prison.

In order to prevent continuing violence in the prison between the two sects, the prison authorities sent approximately eighteen (18) members of the Nation of Islam (the attackers) and approximately twelve (12) members of the New World of Islam (the victims) to Vroom. Dozier was among the latter. It is the judgment of TSP's administrators that intense hostility between the two groups has continued to this day and that assignment of active members of one group to a prison that houses active members of the other group would result in attempts at revenge and further violence.

Meanwhile, the *Wooten* suit was proceeding. As described above, a number of the plaintiffs in that suit (including Dozier) who had been in Vroom when suit was instituted and then released to the TSP general population, had been returned to Vroom for purposes of protective custody.

*Wooten* was terminated by a consent order filed December 14, 1976. The order incorporated a Stipulation of Settlement (the "Stipulation") which was attached to the order, and the complaint was dismissed.

The Stipulation recited that negotiations between the parties had resulted in an agreement, the terms of which were incorporated in the Stipulation. These terms included procedures for transferring inmates to Vroom for disciplinary reasons or protective custody and for periodic review of the necessity for keeping an inmate in Vroom. Of particular pertinence in this case is the provision that "It shall not be a justification for retention of an inmate in the Unit [Vroom], that the superintendent of no other State penal facility is desirous of having the inmate sent to his institution."

The Stipulation also contained provisions obligating the defendant officials to use their best efforts to provide improved programs and facilities to all inmates in Vroom and specifying that "[i]nmates assigned to the R.U. solely for reasons of protective custody shall be confined under conditions which approach, as nearly as is reasonably possible in the Unit, the conditions within the general population areas at Trenton State Prison".

Gradually a number of members of the Nation of Islam were transferred from Vroom back to TSP and some members of the New World of Islam were transferred to Rahway or to the State prison in Leesburg. Several members of the New World of Islam still remain in protective custody in Vroom.

As has been noted, Dozier's transfer to Vroom in October, 1975 was not a disciplinary transfer; it was intended for his protection and for the security of TSP. After 18 or 19 months in Vroom, he complained and asked for transfer back to the general population at TSP. As required by the *Wooten* Stipulation, his continued incarceration in Vroom was reviewed several times by the Inter-Institutional Classification Committee ("IICC"). Initially, the IICC recommended continued protective custody, but in November, 1977 it recommended that

Dozier be transferred to Rahway. Accordingly, Dozier was sent to the general population in Rahway on December 2, 1977.

Dozier remained in the general population at Rahway without incident until April 6, 1978. On that date, while Dozier was working in the food-loading area outside the mess hall, he disobeyed orders. When an officer was sent to discharge him and direct him to return to his wing, Dozier, a young and very powerful man, proceeded to attack the officer until he was pulled away by other guards. The officer's lower lip was split and his front teeth were loosened, requiring many stitches and dental work.

Disciplinary proceedings were conducted and, as a result, Dozier spent fifteen (15) days in the "hole" (solitary confinement) at Rahway and was sentenced to one year in Vroom and the loss of 365 days of his commutation time.

The Rahway records which reflect the April 6, 1978 incident and the discipline imposed bear the typed name of Rahway's then superintendent, R. S. Hatrak. These records, maintained by the Rahway administration, contain at least three entries stating that "inmate is not to be returned to State Prison, Rahway".

In April, 1978, therefore, Dozier was returned to Vroom. He served his year there and his conduct during that time appears to have been reasonably good.

Dozier has no complaints about having been confined up to that point. He recognizes that he committed an offense for which punishment was warranted and he accepted the punishment imposed. His complaint is directed to his continued confinement either in Vroom or in similar protective custody conditions at TSP after he had completed his one-year period of punishment.

On March 29, 1979, when the period of Dozier's punitive confinement was coming to an end, the Vroom Sub-Committee of the Inter-Institutional Classification Committee ("IICC") reviewed his case and determined that he be transferred to "Rahway State Prison by April 24, 1979". Dozier was not

transferred out of Vroom on April 24, and a communication was sent from IICC to Dozier, dated April 25, 1979, stating "Vroom Readjustment Unit pending confirmation of I.I.C.C. decision on 3–29–79 in reference to your transfer to Rahway State Prison."

Dozier protested his continued confinement in Vroom. At the hearing on the order to show cause in this case he testified that both the Director in charge of Vroom and a corrections officer representing Rahway on the IICC informed him that the Rahway unit of the Policemen's Benevolent Association and Rahway officials opposed his return because he had attacked an officer. Gary Hilton, Superintendent at TSP, and a member of the IICC, testified that after the IICC had determined that Dozier should go to Rahway, the decision was questioned by Rahway officials and not implemented. Hilton did not believe Dozier should be sent to TSP because he feared it would reignite tensions between the two Muslim sects.

In response to Dozier's continued protests a hearing was scheduled for October 12, 1979. The hearing officer recommended that Dozier be transferred to Rahway. His decision was based in substantial measure upon the desirability of keeping members of the New World of Islam (such as Dozier) out of TSP. In his report, the hearing officer stated:

Upon further questioning it was learned that Inmate Dozier is a member of the New World Muslim Sect. Further information provided by Director Tard indicates that as a result of the violent disturbances at Trenton in 1975 which involved employees of the World Community of Islam [then known as the Nation of Islam] and the members of the New World of Muslim, that a determination was made to house New World members at Rahway and World Community of Islam members at Trenton or Leesburg. Further on April 24, 1979 the IICC approved Inmate Dozier for transfer to Rahway State Prison.

In view of the fact that Inmate Dozier is a member of the New World Muslim Sect and that these members have been assigned to Rahway, coupled with the ap-

proval of the IICC, this hearing officer recommends that Inmate Dozier be transferred to Rahway.

Notwithstanding this further recommendation and Hilton's concern about bringing Dozier to TSP, the objections of the Rahway prison authorities prevailed and Hilton was instructed by the Commissioner of the Department of Corrections to return Dozier to TSP. Dozier had stated that he had no objection to returning to TSP if he were in the general population.

In his testimony at the hearing in this case Peter Fenton, Superintendent at Rahway, set forth reasons why he had not wished to have Dozier returned to Rahway. He stated that Dozier had a reputation for and history of violence, that although Rahway was a maximum security prison, controls there were looser than at TSP, that he feared Dozier would attack members of his staff again or that members of his staff would overreact to Dozier should any new incident arise, and that it would be destructive of discipline and officer morale were he to reassign the officers who were involved in the April 6, 1978 incident to shield them from contact with Dozier. He conceded that there was talk among the staff along the line of a strike were Dozier to return to Rahway.

On October 25, 1979, Dozier was again brought before the IICC and informed that he would be transferred to TSP. On November 2, 1979 he was transferred to TSP and placed in quarantine pending assignment.

Fearing a renewal of Muslim sect violence if Dozier were placed in the general population, Hilton ordered, on November 5, 1979, that he be placed in TSP's Management Control Unit ("MCU") pending a hearing before TSP's Special Classification Committee. On November 28, 1979 the Committee concluded that Dozier required closer supervision than was available in the general population area and stated:

... Aside from the Committee being genuinely impressed with your favorable positive intentions and motivations toward constructive interactions in general

population, it is nonetheless concluded that due to circumstances, conditions, and deep rooted hostilities, which go beyond your control, you must at this point remain in the Management Control Unit. Given the State's compelling interest in maintaining a safe and secure prison environment, we feel this action is herein justified.

Dozier's appeal from this determination was denied, but he continued to protest his confinement, which differed little from confinement imposed on those being punished for prison offenses.

On January 31, 1980 Dozier was given a protective custody hearing before the same hearing officer who in October, 1979 recommended that Dozier be transferred to Rahway. The hearing officer concluded, in view of Dozier's involvement in the Donald Bourne School incident, his history of violent behavior, and the deep-seated hostility between the two rival Muslim sects, that Dozier should be "placed in PC [protective custody] pending transfer out of state". The hearing officer felt that "while inmate Dozier's transfer to another state would work a hardship on his family, the benefits to inmate Dozier far outweigh the hardship to his family".

Technically Dozier's status was changed to protective custody, but the conditions of his confinement remained as restrictive as before. His situation was very similar to that of an inmate undergoing punishment either in TSP or in Vroom.

Since the time his status was changed to protective custody Dozier has been given further protective custody hearings, each of which has resulted in a denial of his request to be transferred to the general population. As matters now stand, Dozier can only return to the general population of a prison if he requests an out-of-state transfer.

Superintendent Hilton testified that as soon as Dozier reentered TSP, even though he was placed in quarantine, an atmosphere of tension and fear developed among the inmates in the general population. Dozier had a reputation as a "muscleman" and a leader of the New World of Islam group. Weapons were secreted, alliances were sought, and trouble was expected. The inmates were preparing for violence should Dozier leave quarantine, and Hilton concluded that to release Dozier into the general population would pose a substantial risk of a renewal of hostilities between the rival Muslim groups on a much larger scale.

Hilton based this evaluation of the situation upon the reaction of inmates to him when he went through the prison and upon reports from informants and guards. In later talks with Hilton, Dozier informed him that if he felt threatened by the other Muslim group he would not stand by and let someone hurt him. At a meeting with inmates from the rival Muslim factions at which Dozier was present, the inmates assured Hilton that Dozier's release into the general population would not precipitate violence. The same persons, however, acknowledged that the 1975 fracas involved religious issues and that there were distinct differences between the sects. Current information confirmed Hilton's belief, which is shared by officials of the Department of Corrections, that the warfare between the Nation of Islam and the New World of Islam is not over, and that if leaders of the New World of Islam are released into the TSP general population violence will ensue. The prison officials believe that this situation will continue at TSP for the indefinite future.

I have examined *in camera* documents which were available to Hilton during the fall of 1979 dealing specifically with the situation created by Dozier's return to TSP. These include reports from prison officers, informants, and other sources. They tend to corroborate Hilton's evaluation of the situation. Were these documents to be disclosed, TSP's ability to monitor the relationships of the two Muslim groups in the future would be substantially impaired and the safety of informants would be jeopardized. These reasons justify preservation of the confidentiality of these documents, *Jabara v. Kelley*, 75 F.R.D. 475 (E.D.Mich.S.D.1977).

Both Hilton and Richard S. Seidl, Assistant Commissioner of the Department of

Corrections, testified that they believe Dozier has no intent to precipitate an incident at TSP, that he sincerely intends to lead a responsible life in the general population, and that the threat to institutional stability which would exist were he to be released to the general population of TSP arises from a situation over which he has no control.

Thus, Dozier is confronted with the dilemma that if he is to stay in New Jersey he must remain in the confined conditions of protective custody for the indefinite future. Prison officials will not release him into the general population at TSP because of well-grounded fears that such release would precipitate violence. They will not permit him to go to Rahway's general population because the Department of Corrections has acceded to Rahway's Superintendent's protests against his transfer there. The only means by which Dozier can enter the general population in the foreseeable future is to accept an out-of-state transfer, which would separate him from his family.

The issues arise (i) whether the State may constitutionally put Dozier to this choice, and (ii) if so, whether acceding to Rahway's wishes violates the *Wooten* Stipulation of Settlement.

### III. *Conclusions of Law*

A. *Injunctive Relief* : In order to prevail upon his application for preliminary injunctive relief, Dozier must demonstrate a substantial likelihood of success on the merits, that he will suffer immediate, irreparable injury if relief is not afforded, that, in balancing the interests involved, the harm inflicted upon the defendants by granting the requested relief is outweighed by the damage which will be sustained by Dozier if relief is withheld, and that the requested relief, if granted, would not have an adverse impact on the interests of the public, *e. g., Kennecott Corp. v. Smith*, 637 F.2d 181 at 187–191 (3d Cir. 1980); *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515 (3d Cir. 1976).

I shall first consider those aspects of the case which bear upon the likelihood of Dozier's success on the merits.

■ B. *Dozier's Transfer to TSP* : After the IICC recommended Dozier's transfer from Vroom to Rahway, Dozier was trans-ferred to TSP, a prison having far fewer amenities than Rahway. It is now well established that "no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing, absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events". *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *see also Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

■ Under New Jersey law, a prison inmate has no right or justifiable expectation that he will not be transferred from one prison to another. Under State statute the Commissioner of Corrections or his authorized agent has plenary power at any time to transfer an inmate from one prison to another or to some other kind of institution or facility, N.J.S.A. 30:4–85; 30:4–91.1, *et seq., Rocca v. Groomes*, 144 N.J.Super. 213, 365 A.2d 195 (App.Div.1976).

Under regulations adopted by the Department of Corrections, the power to decide upon initial assignments and the subsequent transfer of inmates has been delegated to the IICC (which consists of a permanent chairman and the Superintendents of the Trenton, Rahway and Leesburg State Prisons (or their substitutes)). Certain criteria are now set forth in the regulations upon the basis of which the IICC is directed to base its decisions, Standard 852 of the Regulations of the Department of Corrections. These regulations became effective on October 24, 1979, and apparently codify prior practices.

■ In the present case, the IICC decided, in March, 1979, to send Dozier to Rahway, but in April deferred action on its decision. Ultimately the Commissioner of Corrections overrode the original decision of the IICC and sent Dozier to TSP. Under the statute he had final authority in the matter, and I conclude that, apart from any limitations imposed by the *Wooten* Stipulation, he acted within that authority.

Under *Montanye* and *Meachum* Dozier has no constitutional grounds to object to his transfer to TSP on November 2, 1979.

C. *Dozier's Confinement in Protective Custody at TSP*: As described above, when Hilton received Dozier at TSP he concluded that both Dozier's personal safety and the peace of the institution would be endangered were Dozier released into the general population. Exercising his discretion, Hilton transferred Dozier to MCU and ultimately to protective custody.

■ Prison officials are given broad discretion in dealing with the difficult problems of prison administration, and courts are and should be reluctant to interfere with the exercise of this discretion. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). This is particularly true where the safety of individual inmates and institutional security are at stake.

> Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves .... Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel ... Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve order and discipline and to maintain institutional security.
>
> *Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979) (citations omitted).

■ The fact that Dozier's confinement to protective custody was based upon "predictive judgment" rather than upon the occurrence of a demonstrable act or event does not limit the power of the prison superintendent to require close confinement, *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980).

> Transfers between institutions ... are made for a variety of reasons and often involve no more than *informed predictions* as to what would best serve institutional security or the safety and welfare of the inmate.

*Meachum* [427 U.S.], at 225 [96 S.Ct. at 2538] (emphasis added).

> That an inmate's conduct, in general or in specific instances, may often be a major factor in the decision of prison officials to transfer him is to be expected unless it be assumed that transfers are mindless events. A prisoner's past and *anticipated future behavior* will very likely be taken into account in selecting a prison in which he will initially be incarcerated or to which he will be transferred to best serve the State's penological goals.

*Meachum*, at 228 [96 S.Ct. at 2540] (emphasis added).

Hilton acted reasonably on the basis of information available to him, and it would be inappropriate for a court to substitute its judgment for his.

D. *Dozier's Choice of Indefinite Close Confinement at TSP or Out-of-State Transfer*: Hilton testified that in his judgment the hostility between the two Muslim groups at TSP would make it imprudent to return Dozier to the general population of TSP for the indefinite future. Thus, for as far into the future as he can foresee, Dozier faces the prospect of being held in close confinement in conditions similar to those imposed upon inmates being punished.

Recognizing the severity of this result and the hardship it imposes on Dozier, the correctional authorities have offered Dozier transfer to an out-of-state prison where he could join the general population. Dozier asserts that his constitutional rights are violated by putting him to this choice, for were he to accept such a transfer he would be imprisoned far from his family, preventing them from visiting him.

■ The law is clear that, barring limitations imposed by state law or regulations, the Constitution does not prevent state authorities from transferring inmates from prisons in their state to prisons in another state. This may be done without hearing, without the consent of the inmate, and notwithstanding the fact that the inmate is sent to a prison at a great distance from his family and friends.

In *Meachum v. Fano, supra,* the Supreme Court held that "the Due Process Clause in and of itself" does not "protect a duly convicted prisoner against transfer from one institution to another *within the state prison system*", 427 U.S. at 225, 96 S.Ct. at 2538 (emphasis added); *see also Montanye v. Haymes, supra.*

Cases applying *Meachum* and *Montanye* have held that the power to transfer inmates from one institution to another permits transfer without hearing to prisons in other states. In *Ali v. Gibson*, 631 F.2d 1126 (3d Cir. 1980), the Court upheld a transfer from a prison in the Virgin Islands first to a penitentiary in Atlanta, Georgia, and then a penitentiary in Marion, Illinois, stating:

> ... The Supreme Court has held quite explicitly that unless a statute confers upon a prisoner the right to be incarcerated in a particular prison, the constitution does not require a hearing prior to a transfer.... The district court distinguished *Meachum* and *Montagne* [sic] on the ground that a greater hardship was involved in a transfer from the Virgin Islands to the United States mainland than in transfers wholly within the mainland. This difference, he held, gave rise to a right to a hearing. While we are sensitive to the difficulties that may result from an off-island transfer, we do not believe that they present any more difficulties than a transfer from California to Maine, which can be made, under current law, without a hearing. The *Meachum* and *Montagne* [sic] decisions are based on the Court's conclusion that a prisoner has no liberty interest in remaining at a particular prison. If the prisoner can be lawfully held in the facility to which he has been transferred, he cannot object to that transfer, even if the transfer results in his being placed in a more restrictive or less accessible facility. This analysis is equally applicable to Ali and is not affected by the difficulty of the move. Therefore, no hearing was required by the Constitution.

At 1134–35.

For similar reasons courts have sustained against attack on constitutional grounds transfer from a state prison in Vermont to federal prisons in Massachusetts and Pennsylvania. *Beshaw v. Fenton*, 635 F.2d 239 (3d Cir. 1980), and from a state prison in Delaware to a federal penitentiary in Kansas, *Fletcher v. Warden*, 467 F.Supp. 777 (D.Kan.1979); *see also Shakur v. Bell*, 447 F.Supp. 958 (S.D.N.Y.1978).

*Meachum* recognized that although not required to do so by the Due Process Clause, the states may provide for pre-transfer hearings. If a state does establish such requirements, then the United States Constitution may be relied upon "to insure that the state-created right is not arbitrarily abrogated". 427 U.S. at 226, 96 S.Ct. at 2539.

New Jersey has adopted procedures for out-of-state transfer of inmates. It is a party to the Interstate Corrections Compact, which is designed to permit cooperative use of facilities and programs by the Federal government and by the states which are parties to the Compact. N.J.S.A. 30:7C–1. The Department of Corrections has adopted detailed regulations implementing the Compact and setting forth standards and procedures for transferring inmates to out-of-state institutions. Standards, 868.

The regulations provide that one of the categories of inmates subject to transfer is comprised of "those whose behavior demonstrates that they constitute an exceptional threat to the safety, security or orderly operation of any New Jersey correctional institution or those whose continual presence in a New Jersey correctional institution poses a substantial threat, for any reason, to the inmate himself". Stds. 868(D)(2). The regulations also provide that "[a] request for a non-consensual interstate transfer of an inmate is initiated by the institution's superintendent for any of the following reasons: protective custody; other special security requirements ..." Stds. 868(I).

Procedures are established in the regulations for processing inmate requests for out-of-state transfer, Stds. 868(H), and for processing non-consensual transfers, a hearing being required in the latter situation, Stds. 868(I).

It is apparent that if the proper procedures were followed the New Jersey prison authorities would have the option of transferring Dozier to an out-of-state prison where he could enter the general population. If that were done his only complaint would be his far removal from his family. That complaint does not rise to constitutional dimensions.

■ The corrections authorities have given Dozier a choice: (i) remaining in protective custody at TSP indefinitely, or (ii) entering into the general population in an out-of-state prison. Since at least the second of these two options passes constitutional muster, requiring Dozier to make the choice is not violative of his Due Process rights.

In view of this conclusion it is unnecessary in this case to address the question whether the Constitution imposes some limit upon the length of time an inmate may be required to endure onerous conditions of protective custody or whether, after a period of time has run, the Constitution imposes a duty upon prison officials to take affirmative steps either to improve conditions in the protective custody unit so that they will be similar to conditions in the general population areas, *see Wojtczak v. Cuyler*, 480 F.Supp. 1288 (E.D.Pa.1979), or else to find some facility where the inmate can enter the general population.

E. *Failure to Transfer Dozier to Rahway*: New Jersey limited its uninhibited discretion to transfer inmates to out-of-state prisons when it adopted the regulations implementing the Interstate Corrections Compact. In similar fashion, it limited its uninhibited discretion to refuse to transfer inmates within the State prison system when it entered into the Stipulation of Settlement in the *Wooten* case.

Paragraph 6 of the *Wooten* Stipulation provides that "[i]t shall not be a justification for retention of an inmate in [Vroom], that the superintendent of no other State penal facility is desirous of having the inmate sent to his institution". The language of paragraph 6 must be examined to determine whether it prohibits Rahway Superintendent Fenton's resistance to Dozier's as-signment to Rahway and the resulting confinement of Dozier in protective custody at TSP.

A rational interpretation of paragraph 6 of the Stipulation would permit retention of an inmate in Vroom if the superintendent of the proposed receiving institution had a reasonable basis for opposing the transfer. By the same token, it would not be a justification under paragraph 6 to retain an inmate in Vroom over objections of the receiving institution which were arbitrary or had no reasonable basis.

In the present case, the evidence leads to the conclusion that Dozier was refused permission to transfer from Vroom to Rahway in accordance with the IICC decision simply because Fenton and his officers did not want him back rather than for sound reasons of prison administration.

It is apparent from Dozier's Assignment, Disciplinary and Transfer Progress Report (Ex. D–1A) that when Dozier was sent from Rahway to Vroom in April, 1978, after striking the officer, the Rahway officials had decided that whatever transpired in the future they did not wish to have Dozier back after completion of his punitive confinement. In three places on the page of the Report completed at Rahway there appear the words "Inmate is not to be returned to State Prison Rahway". Assistant Commissioner Seidl testified that it was improper for the Rahway authorities to make such a notation and that it would not be given effect. Proper or not, it reflects the state of mind of the Rahway officials and casts light on their future actions.

On two occasions after Dozier had completed his 365 days punitive confinement in Vroom responsible bodies of the prison system decided that Dozier should be returned to the general population at Rahway. In March, 1979 the IICC determined upon a "[t]ransfer to Rahway State Prison by April 24, 1979". In October, 1979, after a hearing, Hearing Officer Casarella reported, "In view of the fact that Inmate Dozier is a member of the New World Muslim Sect and that there [sic] members have been assigned to Rahway, coupled with the approval of

the IICC, this hearing officer recommends that Dozier be transferred to Rahway."

Both the IICC and the hearing officer had available to them Dozier's full record and must have been aware of his past transgressions in and out of prison. This did not prevent them from designating Rahway as the appropriate place of confinement.

The evidence also demonstrates that Rahway had a policy of not taking back inmates who had attacked officers. Andrew Creaturo, a Senior Corrections Officer at Rahway and Executive Vice-President of the PBA Local at the prison, testified that there was no agreement between the PBA and the administration of the prison that inmates who struck officers would not be returned to Rahway. On cross-examination he conceded that there was such a prison policy. Dozier testified that he was informed both by the Director of Vroom and by Rahway's representative on the IICC that his return to Rahway was opposed by both the Rahway administration and the Rahway PBA because he had attacked an officer. Rahway Superintendent Fenton testified that there was talk among the staff at Rahway along the line of a strike were Dozier to return.

Assistant Commissioner Seidl testified that there is no policy in the Department of Corrections that an inmate should not be returned to Rahway if once he attacked a Rahway officer. TSP's Superintendent Hilton testified that such a policy is not a proper subject of collective bargaining. As to guards having to deal with inmates who once assaulted them, Hilton testified:

Q. ... I assume that people assault guards from time to time in your prison?

A. Unfortunately more than we would like.

Q. Since you are the end of the line as far as maximum security goes, the inmates eventually come back to your prison even though they have assaulted guards?

A. In many cases don't leave.

Q. Have to deal with the same guards after they have assaulted them?

A. Yes. Well, periodically if we have had a particularly emotional episode, we may do certain intramural things, but we just can't say that a prisoner is beyond our capacity to control.

Q. Or that the guards are beyond your capacity?

A. —to control and frequently we get in problems for trying to do that, but people criticize it, but that is what we get paid for.

Officer Creaturo, who was present during the April, 1978 episode when Dozier assaulted a guard, testified that if Dozier returned to Rahway he would not be affected in his dealing with Dozier, that he could not express an opinion with respect to the officer who was assaulted but that most officers in the prison were steady and would conduct themselves appropriately.

■ Thus it is apparent that when Rahway's Superintendent refused to take back Dozier he was doing so for reasons that were not in accordance with policies of the Department of Corrections. When the Department deferred to his wishes it violated paragraph 6 of the *Wooten* Stipulation. In effect, and within the meaning and intent of the Stipulation, the Department justified its retention of Dozier in Vroom on the ground that the Superintendent of Rahway did not desire having Dozier sent to his institution. The evidence referred to above strongly suggests that the reasons developed at the hearing and set forth in defendants' brief were developed after the fact and were pretextual.

Paragraph 6 of the *Wooten* Stipulation is a state-created right, and under *Meachum* the Due Process Clause insures that this right will not be arbitrarily abrogated, *see also Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Failure to transfer Dozier to Rahway was an arbitrary abrogation of this right. Since he had the right not to be denied transfer to Rahway because its Superintendent did not wish to have him there, the choice between indefinite confinement in protective custody at TSP and out-of-state transfer was not a proper one, and in light of the *Wooten*

Stipulation violated his constitutional rights.

Further, the provisions of the *Wooten* Stipulation of Settlement were "incorporated in and made a part of" an order of this Court filed December 14, 1976. This decree creates rights separate and apart from rights arising under the Due Process Clause. It is unnecessary to decide whether Vroom inmates who were not parties to the *Wooten* case may seek enforcement of the order and Stipulation. Dozier was a party to those proceedings and clearly is entitled to seek enforcement of its terms in this Court.

Consequently, Dozier has demonstrated a substantial likelihood of success on the merits.

F. *Other Prerequisites for Injunctive Relief*: Having established that there is a substantial likelihood that he will succeed on the merits, Dozier is entitled to preliminary injunctive relief if he establishes the three other equitable bases for such relief.

As to irreparable injury, Dozier is presently suffering such injury in that he is confined under conditions resembling those to which inmates being disciplined are subjected. These conditions are far more onerous than conditions under which inmates in the general population live. Dozier is not subject to punishment, having completed his disciplinary sentence nearly ten months ago. As found above, the failure to transfer him to Rahway is in violation of an agreement filed in this Court to which he and the State are a party. This constitutes immediate, irreparable and continuing injury.

As to the harm which would be inflicted on the defendants were preliminary injunctive relief granted, there is none. It is only at TSP that there are circumstances which render it dangerous to release Dozier into the general population. These circumstances do not prevail at Rahway. Both the IICC and a hearing officer have concluded, after due deliberation, that Dozier should be transferred to Rahway. He was not transferred because the Superintendent at Rahway prevailed upon the Commissioner of Corrections to send Dozier to TSP. The Superintendent sought to effectuate his own and his officers' tacit policy or understanding that an inmate who attacked an officer would never be allowed back at Rahway. This is not the policy of the Department of Corrections, and when the Commissioner deferred to the Rahway Superintendent in this regard he violated paragraph 6 of the *Wooten* Stipulation. An order requiring Dozier's transfer to Rahway would not violate any policy of the Department of Corrections and it would do no more than require the prison authorities to do what they have agreed to do.

As to the impact of preliminary injunctive relief upon the interests of the public, there would be no adverse impact. The public has interests in the protection of constitutional rights and in the protection of rights which the State has created by agreement.

IV. *Conclusion*

Dozier has established his right to preliminary injunctive relief. An order will be entered directing his transfer from protective custody at TSP to the general population at Rahway. Dozier's attorney is requested to submit a form of order. Prior to the submission of that order, I ask that the attorneys for the parties consider whether it would be appropriate to order, pursuant to *Fed.R.Civ.P.* 65(a)(2), that the trial of the action on the merits be advanced and consolidated with the hearing which has been held on the pending application to the end that the order implementing this opinion will be the final judgment in this case.