**Lamont CALLOWAY, Al Chavies, and James Coy, Plaintiffs,**

v.

**William FAUVER, Commissioner of Corrections; Gary J. Hilton, Superintendent, Trenton State Prison; Elijah Tard, Director, Vroom Readjustment Unit; and Joseph G. Call; Chairman of the Inter-Institutional Classification Committee, individually and in their official capacities, Defendants.**

Civ. A. No. 79–2187.

United States District Court,
D. New Jersey.

Aug. 2, 1982.

Louise A. Halper, Prisoners' Rights Organized Defense, Newark, N. J., for plaintiffs.

Robert A. Shire, Deputy Atty. Gen., of N. J., Trenton, N. J., for defendants.

## OPINION

DEBEVOISE, District Judge.

Plaintiffs Lamont Calloway and James Coy are inmates who, since the fall of 1975, have been confined in protective custody in the Vroom Readjustment Unit ("Vroom") of Trenton State Prison ("TSP"). Plaintiff

Albert Chavies was confined in protective custody in Vroom from November, 1975 until June, 1979 when he accepted a transfer to a prison in Virginia.

Defendant William H. Fauver was, at the time of the filing of the complaint in July, 1979, and remains Commissioner of Corrections. When the complaint was filed defendant Gary J. Hilton was Superintendent of TSP. He has since become Assistant Commissioner in the Department of Corrections. Defendant Elijah Tard, Jr. was Director of Vroom when the complaint was filed and is now Superintendent of TSP. Defendant Joseph G. Call was, at the time of the filing of the complaint, and remains a Deputy Director of the Division of Adult Institutions within the Department of Corrections. During the period pertinent to this action he served as Chairman of the Inter-Institution Classification Committee ("IICC").

The complaint sought relief authorized by 42 U.S.C. § 1983 and asserted jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). Plaintiffs seek damages and declaratory and injunctive relief.

In brief, plaintiffs alleged in their complaint that in October, 1975, without prior hearing, they were placed in protective custody at TSP and that in November, 1975 they were transferred to Vroom, where they have remained in protective custody ever since, subject to the very onerous conditions which prevail in that institution. Plaintiffs further alleged that they have been kept in protective custody over their objections and without the opportunity to present evidence that such custody is unnecessary. Three broad legal grounds for relief were asserted: (i) Plaintiffs were deprived of procedural due process when they were placed and continued in protective custody. (ii) The conditions under which plaintiffs are confined (or, in the case of Chavies, were confined) in Vroom, which are no different from the conditions of confinement of prisoners held there for disciplinary reasons, violate their constitutional rights. (iii) Continuation of plaintiffs in protective custody in Vroom for the reason that no superintendent of another State prison wished to accept them violates the consent decree dated December 14, 1976 settling the case of *Wooten v. Klein*, Civil Action No. 75–179. During pretrial proceedings plaintiffs moved to reopen proceedings in *Wooten* and to consolidate that case with this one. The motion was denied, but the complaint in this action was amended to include an allegation that plaintiffs have been denied the rights to which they are entitled under the consent decree in *Wooten* and to include a prayer for relief seeking enforcement of that decree.

Defendants answered, raising the usual affirmative defenses in a § 1983 action.

In November, 1979 plaintiffs moved for a preliminary injunction restraining defendants from continuing to hold Calloway and Coy in protective custody in Vroom without affording them a hearing comporting with due process requirements. After finding that from October 16, 1975, when they were placed in protective custody, until the date of the hearing on their motion Calloway and Coy had not received a hearing meeting the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), I concluded that plaintiffs were likely to prevail on the merits on the issue raised by the motion. I held that a person confined in protective custody must periodically be given the opportunity to contest the need for continued confinement. I ordered defendants to provide those two plaintiffs with a hearing comporting with *Wolff v. McDonnell* standards, as appropriately modified to meet the circumstances of the present case. A hearing was held on February 22, 1980. Calloway and Coy assert that it did not comport with due process requirements primarily because much of the evidence consisted of confidential information which was not disclosed to them.

Defendants submitted to the Court the evidence which was used at the February, 1980 protective custody hearing and which was not disclosed to plaintiffs. They moved that it be impounded. I reserved decision on the motion until the time of trial. By that time, due to changed circumstances,

defendants concluded that they were in a position to make most of this evidence available to plaintiffs. I examined the balance of the material which defendants asked not be released and concluded that its release would occasion the risk of identifying informants and of disclosing investigative techniques and sources, thereby undermining the ability of prison authorities to maintain order and avoid violence in the prison system.[1] I ordered that it be filed in the case under seal. I have examined these documents in connection with the preparation of this opinion. They add little of substance to the evidence in the record but provide some additional support for defendants' conclusion that plaintiffs' release into the TSP general population would endanger them and threaten institutional security.

The case was tried and an extensive record developed.

### Findings of Fact

A. *Background*: At the heart of this case lies the intense rivalry and hostility between two of the quite numerous Black Muslim factions.

On the one side is a group originally known as the Nation of Islam. It has gone through various permutations and changes of name over the years, developing subgroups and factions in the process. During the period relevant to this case its members, or significant factions, have called themselves the World Community of Islam, the World Community of Islam in the West and, most recently, the American Muslim Mission. In an attempt to avoid confusion I shall refer to this general group collectively as the Old World of Islam.

Plaintiffs are members of the group known as the New World of Islam and will be referred to as such in this opinion.[2] Both groups have extensive memberships in the New Jersey State Prison, and the New World of Islam resulted from a split within the Old World movement at TSP.

Just prior to September, 1973 the New World group included members in prison and at large in the community. Plaintiffs were among the members at large. The New World sought to take control of the Old World of Islam's Mosque No. 25 in Newark. To accomplish this end it was concluded that it was necessary to kill the Minister of the Mosque, James Shabazz. On September 4, 1973 he was murdered in front of his home in Newark.

A number of New World members, including plaintiffs, participated in the planning and execution of the murder. All were apprehended, tried and convicted of the crime. Upon arrival at TSP in 1974 they were placed in protective custody in Vroom to avoid retaliation against them by Old World members, who were then a powerful force at TSP.

1. The reasons for my ruling are set forth in an opinion I delivered from the bench during the trial. In essence, I found that defendants were entitled to rely on an informer's privilege and an official or state secret privilege. *Rovario v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); *cf.*, *Helms v. Hewitt*, 655 F.2d 487 (3d Cir. 1981).

2. There was some uncertainty in the testimony whether a group called the Farrakhanians (followers of Minister Farrakhan) was an outgrowth of the Old World Muslims. In addition, there appear to be Muslim groups which are neither Old World nor New World Muslims— the Sunis, Orthodox, Achmadians, Shiites, Fatimites, and followers of Ayotollah Khomeini. It would seem that there is some flow of membership back and forth among the different groups and that the rise and fall of each group is somewhat dependent on the power of its leadership at any given moment. The programs of these bodies range from religious in the traditional sense to political—seeking power and control within the prisons. Some groups seek to organize along military lines and adopt a form of uniform to the extent tolerated by prison administrators. Needless to say, the existence and activities of these various bodies, much of which is secret in nature, create very difficult problems of prison administration, requiring a constant balancing of the requirement that religious practices be permitted and the necessity of preserving order and control within the prisons. The balancing process is made more difficult by reason of the fact that accurate information is not easily obtained.

The New World members sought release from the restrictive conditions in Vroom and they and their families petitioned prison authorities for transfer of New World inmates to the general population at TSP. They assured the authorities that they would be safe. Gradually New World members were transferred to TSP. By October, 1975 all of the New World inmates had been removed from Vroom and were in the TSP general population.

On October 16, 1975 the Old World members launched a heavy attack on the New World group in the Donald Bourne School at TSP. Stolen knives and chisels and homemade weapons were employed. One New World member was killed and three, including Chavies and Calloway, were seriously wounded.

The prison administration promptly transferred the Old World and New World participants in the fracas to Vroom in order to separate the combatants. Gradually, in the years that followed, the Old World members in Vroom were returned to the general population at TSP. It was decided to return the Old World members to TSP because their group was the more numerous and had a large following at TSP. During the same period the lesser leaders of the New World faction were transferred out of Vroom. Most went to the State Prison at Rahway, where the Old World membership was smaller and which did not house the most powerful Old World leaders.

However, the prison authorities concluded that if they were to send the three plaintiffs back into the general population of any State prison there would be a recurrence of the Bourne School episode. It is the authorities' firm belief that the Old World members are simply biding their time until Calloway, Chavies and Coy are returned to the general population before they seek once again to avenge the death of Minister Shabazz. The authorities can foresee no time when this threat will be gone and, therefore, hold out to plaintiffs only two alternatives—either indefinite confinement in protective custody in Vroom or transfer to the general population in an out-of-state prison.

B. *Plaintiffs' Transfer to and Retention in Vroom* : The transfer of inmates to protective custody and retention in that status is the subject of Standards adopted by the Department of Corrections. Standards 256 (Administrative Segregation) as adopted March 24, 1975 was in effect in October and November, 1975. It provided that inmates could be transferred to administrative segregation "to aid in assuring the safety and security of the institution, for the protection of themselves or others, or because of their inability to get along in the general population", 256.210. The Standards further provided that "Any inmate to be placed in administrative segregation against his will for any reason is entitled to all the procedures specified in Standards 254. ADJUSTMENT COMMITTEE OR HEARING OFFICER", 256.212.

Specifically as to protective custody, Standards 256.271 stated:

A protective admission to administrative segregation is only made where there is substantial evidence that such action is necessary, unless the inmate consents, in writing, to confinement in the unit. Protective custody is used only for short periods of time except where an inmate needs long-term protection and the facts are well documented.

Where the inmate does not consent to an assignment to protective custody or where the inmate requests reassignment and such reassignment is not made within two weeks of the date of request, the Superintendent or his designate immediately orders a hearing and submits a full report to the Director as to the reasons for the protective custody of the inmate in administrative segregation.

Where the inmate consents to confinement, the inmate may at any time request reassignment to the general population and such request is carried out within two weeks after the date the request is signed unless there is a hearing by the adjustment committee and there is substantial evidence to show that protective custody in the unit is necessary.

Any inmate admitted with his consent signs an agreement to the above conditions.

The 1975 Standards (256.279) established a review committee in Vroom to review every inmate's case once a month. If the review committee recommended release to the IICC, the latter committee made the determination whether to release the inmate from Vroom. In addition, "every inmate in administrative segregation is reviewed by the classification committee or Inter-Institutional Classification Committee in the case of Vroom Readjustment Unit inmates within six months of admission and the three month intervals thereafter". Rejections "should well document that the reason for the initial placement has not ceased to exist, that other alternatives, such as detention, transfer, or reclassification, are inadequate for assuring non-dangerous behavior from the inmate; and that the inmate's return to the general population would continue to pose a serious threat to life, property, himself, staff, other inmates or the security of the institution".

Finally, Standards 256.279 provided that: When an inmate has been confined to administrative segregation for one year and the classification committee or Inter-Institutional Classification Committee intends to retain the inmate in this status, a report is forwarded to the Division Director for his review. Such cases are reviewed annually by the Division Director should confinement in administrative segregation continue for this extended period of time.

These Standards were updated and revised in 1976 (10:35–69.1, *et seq.*) and in 1980 and 1981 (Standards 142).

The IICC consisted of a chairman and a representative from each of the three major State Prisons—Trenton, Rahway and Leesburg. It was the responsibility of IICC to classify and assign inmates coming into the State Prison system from the county jails, to effect transfers of inmates from one State Prison to another, and to review administrative segregation punitive and protective custody cases. Defendant Joseph G. Call was Chairman of the IICC during most of the time when plaintiffs were confined in protective custody at Vroom.

Each of the plaintiffs was injured in the October 16, 1975 incident. Calloway was hospitalized for one day and then was sent directly to Vroom. Chavies was hospitalized for ten days outside the prison and then stayed for ten days at the TSP hospital before being sent to Vroom. Coy was one of the most severely wounded. After having three operations in an outside hospital he was transferred to the TSP hospital and was then sent to protective custody in Vroom. He testified that TSP's then Superintendent had asked him to sign himself into Vroom voluntarily, stating that it made no real difference because he was going there one way or another.

In any event, no hearings were held before sending any of the plaintiffs to Vroom. It is difficult to determine whether their initial transfer to protective custody might be considered voluntary in the first instance. Each had come very close to being killed, and each must have recognized that he required some form of protection against the numerically larger Old World group.

The record does not show that plaintiffs received a monthly review by the Vroom committee during 1976 and 1977, although it is possible that reviews were conducted and not noted on plaintiffs' prison records. After 1978 the monthly reviews appear to have been conducted with substantial regularity. It does appear, from the prison records, that plaintiffs were reviewed by IICC with the required frequency.

At least as early as 1977 plaintiffs sought release from protective custody. Both singly and jointly they commenced and continued sending a barrage of letters to Robert Hatrak, who was Superintendent at Rahway, Hilton, who was then Superintendent at TSP, Fauver, and other prison authorities. These letters pointed out, as was the fact, that the members of the Old World group who had attacked plaintiffs had been returned to the general population (for the most part at TSP) and that most New

World members had been sent to the general population at Rahway without untoward events taking place. Plaintiffs asked to be sent to Rahway also, and were able to present written assurances from leaders of the major Muslim groups at Rahway that plaintiffs' presence would not create any threats to plaintiffs or to the general peace of the institution.

These requests were presented to the IICC, and plaintiffs repeated them in person at meetings of the IICC and to individual members of that body. It cannot be determined from the record when plaintiffs first made their oral requests, but it seems likely that they commenced at about the date when the written requests were first issued. The initial reports of the Vroom classification committee suggest that in 1975 and 1976 plaintiffs' protective custody was viewed by the prison authorities as being voluntary. For example, next to the entry on the report form reading "Review your case" there were inserted the words "upon request for release". It is clear, however, that by February or March, 1977 the IICC and the defendants in this case knew or should have known that plaintiffs sought release from protective custody. If plaintiffs are deemed to have consented to the original transfer to protective custody, this triggered the provisions of Standards 256.271 (later 10:35–69.5(c)) which required transfer to the general population "unless there is a hearing by the adjustment committee and there is substantial evidence to show that protective custody in the unit is necessary".

Both the Vroom classification committee and the IICC continued to review plaintiffs' confinement in protective custody. Invariably these bodies concluded that there was no change and that plaintiffs' lives would be in danger if they were transferred to the general population of any State prison.

As mentioned previously, the IICC had a Chairman (defendant Call during the period from 1977 until very recently) and a representative from each of the three major State Prisons—TSP, Rahway and Leesburg. The most detailed information concerning the threats to plaintiffs came from intelligence gathered at TSP. The substance of this information is set forth in the confidential documents, most of which have been admitted in evidence (Exhibit D2). These documents were not submitted to the IICC meetings, but the TSP representative on the IICC reported the substance of them to the full committee.

The documents contain a brief history of the Black Muslim movement, describe incidents of Muslim violence which occurred in the years before the Shabazz murder, and relate details of the Shabazz murder and of the Donald Bourne School incident. There are reports of informants describing Muslim activity at TSP and on occasion suggesting that violence was likely if New World leaders were returned to TSP. Most of the information is old, but it was supplemented from time to time by reports from prison guards and inmate informants. It by no means conclusively established that if plaintiffs returned to TSP's general population they would be killed or injured or that their return would spark prison violence. However, it was sufficient to justify concern for plaintiffs' safety at TSP and for the peace of the institution.

The information concerning threats to plaintiffs at Rahway was even less concrete than the information relating to TSP. It was provided by Richard W. Curran, who was responsible for gathering intelligence at Rahway and who had been Rahway's representative on the IICC since 1974. During the gradual release of New World members into the general population at Rahway he received information from inmate informants that there would be no problems unless the three plaintiffs were among them. According to Curran's informants, plaintiffs would be killed to avenge Shabazz's death whenever and wherever they were released in the State Prison system, but that other New World members would not be harmed, since that would jeopardize the chance that plaintiffs would be released. According to Curran this information was relied upon by him and the IICC to release the other New World mem-

bers to Rahway. He testified that he first received this information in 1977, that it was provided by two informants independently of each other, that he considers both informants to be reliable on the basis of past dealings with them, and that the information has been repeated as recently as late 1981.

Acting upon Hatrak's instructions, Curran gave this information to the IICC and it was the basis for IICC's decision not to release plaintiffs to the Rahway general population. These reasons were applicable to Leesburg, and, in addition, the IICC believed that considering the nature of plaintiffs' offenses, Leesburg, a lesser security prison, would not be an appropriate place for them.

In view of the fact that it did not appear that the dangers to plaintiffs would ever dissipate, the IICC responded to their requests for transfer to Rahway with the suggestion that they apply for an out-of-state transfer. In another state it would be possible to place plaintiffs in the general population.

The Department of Corrections went to considerable pains to arrange out-of-state transfers for the three plaintiffs. Negotiations were undertaken with prison authorities in Virginia, Florida and Connecticut. Plaintiffs were not easily placed, and it was necessary for the Department of Corrections to agree to take two out-of-state inmates for each of the plaintiffs.

In June, 1979 Chavies accepted a transfer to the general population of a prison in Virginia. Florida authorities agreed to take Coy but after accepting the transfer Coy reversed his position and decided to await the outcome of this case. By that time Florida's agreement will no longer be binding and it will be necessary for the Department to reinstitute negotiations. Connecticut authorities had not committed themselves to take Calloway, but he has not evidenced any desire to accept an out-of-state transfer.

As described above, I ordered that Calloway and Coy be given full hearings comporting with *Wolff v. McDonnell* require-ments. Such hearings were held commencing on February 22, 1980, at which plaintiffs produced evidence in the form of statements of Rahway inmates that they would be safe in Rahway. The hearing officer received confidential documents, which generally contained the same information which had been made available to the IICC. He concluded that plaintiffs would be in grave danger if released to the general population of TSP or any other State Prison, and recommended that plaintiffs remain in protective custody.

C. *Wooten v. Klein* : In February, 1975 a suit was instituted which, according to the complaint, comprised:

> . . . a constitutional challenge, under the due process, equal protection, right to counsel and cruel and unusual punishment clauses, to (a) arbitrary procedures for determining when an inmate is to be transferred to the R.U. [Vroom]; (b) the deprivation of virtually all freedom, rights of association, access to prison programs, and proper medical care and other necessities at the R.U.; (c) the arbitrary infliction of summary punishment in the form of physical brutality at the R.U.; and (d) the arbitrary methods in which it is determined whether inmates have 're-adjusted' and can thus be released from the Readjustment Unit.

The plaintiffs in the suit, *Thomas Wooten v. Ann Klein*, Civil Action No. 75–179 ("*Wooten*"), were 58 of the 66 persons then confined in Vroom. Calloway, Chavies and Coy were among them. They were represented in the action by the Office of the Public Advocate-Public Defender. Some of the plaintiffs had been confined to Vroom for disciplinary reasons; some, like the plaintiffs in the present case, had been confined for protective custody. The defendants in the *Wooten* action were the Commissioner of the Department of Institutions and Agencies, which was responsible for administering the State Prisons, and a number of other departmental and prison officials.

Pretrial proceedings in *Wooten* were pursued during 1975 and 1976. During the same period there occurred certain of the events described above: Plaintiffs were transferred from Vroom to the general population of TSP; the New World of Islam members were attacked in the Donald Bourne School; plaintiffs were returned to protective custody in Vroom.

*Wooten* was terminated by a consent order filed December 14, 1976. The order incorporated a Stipulation of Settlement (the "Stipulation") which was attached to the order. The complaint was dismissed. The Stipulation recited that negotiations between the parties had resulted in agreement, the terms of which were incorporated in the Stipulation.

Paragraph 1 of the Stipulation governed transfers to Vroom either for disciplinary reasons or for protective custody. Since plaintiffs were already in Vroom when the Stipulation was filed those provisions are not relevant in this case. Similarly, paragraph 2, relating to counseling of inmates transferred to Vroom for disciplinary reasons, is not applicable here.

Paragraphs 3 through 6 provided for periodic review of the status of Vroom inmates:

3. Each R.U. inmate shall be reviewed at least monthly by a committee of custodial, treatment and administrative staff. If not recommended for release he shall be informed of that fact, verbally or in writing; and he shall also be given the reasons behind that determination unless security considerations preclude their disclosure, in which case a notation to that effect shall be placed in his file.

4. The Inter-Institutional Classification Committee, or a comparable body should the IICC cease to exist, shall review the case of each R.U. inmate no later than six months after his admission to the Unit, and at no less than three month intervals thereafter, on the basis of reports prepared by Unit staff and others as needed. The inmate shall be notified in writing and in detail if rejected for release by that body.

5. Whenever an inmate has been confined in the R.U. for one year and the Inter-Institutional Classification Committee (or some comparable body) has decided to keep him there beyond that point, there shall be forwarded to the Division Director a complete report on the inmate, and the Director shall personally review the case and either ratify or disapprove the Committee's decision. Reviews of this sort shall be accomplished at least annually should an inmate remain in the Unit for an extended period of time.

6. It shall not be a justification for retention of an inmate in the Unit, that the superintendent of no other State penal facility is desirous of having the inmate sent to his institution.

Paragraph 7 provided that the "defendants shall use their best efforts to maintain regular programs of recreation, education and treatment for all inmates in the Readjustment Unit, and to maintain the facility in a healthful and sanitary condition". Paragraph 8 made special provision for inmates who, like plaintiffs, had been transferred to Vroom solely for reasons of protective custody:

8. Inmates assigned to the R.U. solely for reasons of protective custody shall be confined under conditions which approach as nearly as is reasonably possible in the Unit, the conditions within the general population areas at Trenton State Prison. The determination of what is 'reasonably possible' shall be accomplished with due regard for the nature of the Unit's physical plant, for security considerations, for the special precautions which the maintenance of a protective custody unit requires, and for the Division's manpower and budgetary limitations.

As to legal assistance the Stipulation provided:

9. The Division shall undertake to have at least one member of the Inmate Legal Association at Trenton State Prison (or some other approved inmate or staff member) visit the R.U. at least three times a week (or more often, if it proves necessary) for the purpose of ren-

dering legal assistance to Unit inmates and for that of transporting requested legal materials to the R.U., on a short-term loan basis, from the law library at Trenton State Prison.

The Stipulation further provided that "This action shall be dismissed with prejudice as to all defendants, without costs; provided, however, that the dismissal shall be without prejudice to the bringing of an action in state or federal court, within 120 days of the dismissal of the instant case, by any individual plaintiff regarding any personal claim he may have relating to alleged acts of brutality against him." The order accompanying the Stipulation provided that "Plaintiffs' complaint is dismissed without costs, pursuant to said Settlement Agreement, as against all of the defendants as to all counts and causes of action alleged therein."

D. *Post-Wooten Conditions in Vroom*: There is very little dispute about conditions in Vroom. The life of an inmate transferred there for protective custody differs little, if at all, from the life of an inmate confined in Vroom for disciplinary reasons. Of the 130 inmates in Vroom, approximately 80 are in protective custody.

There are 20 cells on each of the seven tiers. The cells on each tier face onto a corridor which has windows on the wall across from the cells. The cells measure about 8 × 10 feet and each houses one inmate. In TSP a cell of this size is often used to house two inmates. Inmates are allowed to have books and magazines, writing materials, a radio and television set, and other personal possessions in their cells. Each cell is equipped with a bed, toilet, sink, a single electric light and a foot locker. There are no chairs or tables. Plaintiffs testified that they are provided with a single 60-watt light bulb which is totally inadequate for reading. Although defendants offered testimony that 100-watt bulbs are available on request, plaintiffs' requests for such bulbs went unheeded.

Each day an inmate spends 22 to 24 hours in his cell. Hot meals are served three times a day and are eaten alone in the cell.

Each inmate is allowed a two to two and one-half hour recreation period in the prison yard two or three times a week. Recreation in the yard is conducted by tier—two tiers having recreation each day, with an additional period in the evening during the summer. This provides an opportunity for basketball, handball and jogging. It is the only opportunity inmates have to socialize with each other. An inmate is given ten minutes in the shower each day.

There is an attempt to create jobs for inmates so that they can earn spending money and gain work credits. A few of these jobs have some substance, such as serving as a cell block runner or insuring that equipment is picked up after a yard period. Most of the jobs are in the nature of a fiction—such as librarian for a non-existent library or "cell-sanitation".

For a period of five or six months several years ago, college level courses were offered through an arrangement with Mercer County Community College. A lack of funds required termination of the program. Courses are provided at the secondary level.

No inmates in Vroom are permitted to have contact visits. The inmate and his visitor observe each other through a 10" × 10" heavy glass window. They communicate by means of a telephone. There are no congregate religious services in Vroom.

A social worker is available full-time five days a week, and upon request he obtains reading material for inmates from the library at TSP. Recently a law library has been installed in Vroom to which inmates have access when a time can be scheduled.

In 1972 inmates were allowed to congregate eight at a time in the tier area outside their cells. There they could walk around, watch television and converse. This resulted in numerous assaults and in September of that year seven inmates escaped as a result of the program. Consequently it was terminated.

A psychologist visits Vroom from time to time.

Calloway and Coy testified about the effect this confined existence has had upon

them. Unlike the disciplinary cases and most other protective custody cases, their stay in Vroom has not been for a limited period of several months or for a year or so. They have had to endure the monotony and isolation of Vroom for nearly seven years, with no prospect of it ever ending.

Calloway and Coy each assert that they have become withdrawn and non-communicative and that psychologically they cannot endure these conditions much longer. Their eyes, they claim, have deteriorated because of the bad light.

Plaintiffs' psychologist, Daniel Williams, Ph.D., testified that both Coy and Calloway are persons of good intelligence who have adapted to the situation in which they find themselves. In his opinion neither suffers from psychoses. Coy is reacting to the frustrations of his confinement with suppressed anger, Calloway with depression. According to Dr. Williams their isolation deprives them of the contacts with people and other mental stimulation which people must have, and continued isolation will have a dulling effect upon them and could lead to a breakdown. The observations of the defendants' psychologist, George H. Saxton, Ph.D., were not significantly different from those of Dr. Williams. He concluded that both Calloway and Coy were intelligent and had strong personalities which had enabled them to surmount the pressures resulting from the conditions of their confinement. Based upon plaintiffs' history of successful adaptation to difficult circumstances, Dr. Saxton concluded that loss of this law suit and the prospect of indefinite confinement in Vroom would cause Calloway and Coy temporary depression but not a breakdown. According to him, they have coped in the past and they will cope just as well in the future.

Defendants presented persuasive evidence supporting their contention that the restrictions imposed upon inmates in Vroom are necessary for sound penological reasons. This evidence consisted of testimony of New Jersey corrections officials directly responsible for running Vroom. It also consisted of the testimony of a person who is not a stranger to this Circuit. Defendants called as an expert witness Charles E. Fenton, Jr. He is presently a consultant on correction for the State of Massachusetts. He has had a long and varied career in the field of correction. Much of his experience has been with tight security prisons—at Marion, Illinois, which replaced Alcatraz as the most secure federal prison, at Lewisburg in Pennsylvania, and at Walpole in Massachusetts.

Fenton inspected Vroom and reviewed its programs and procedures. In his opinion the physical facilities are relatively modern, giving "an impression of amplitude for a relatively small population". For a close custody unit it has extensive recreation space and adequate space for visitation and pre-visit shakedown. Fenton observed that the light, air and cleanliness of the building were consistent with its relative "modernity". He found the cells more spacious than usual and that each had adequate plumbing and lighting. He concluded that the prison authorities had struck a healthy balance between security needs and the desire of inmates to have a large amount of personal possessions in their cells.

In Fenton's opinion, Vroom is one of the three most secure prison units he has seen during his long career. This is appropriate to its mission as the repository of the entire system's most violent and most escape-prone inmates. Of necessity, those who are confined for protective custody reasons and those confined for disciplinary reasons must be subjected to the same limitations and controls. Many inmates in protective custody are violent and escape-prone, and all of them must have around-the-clock protection from other inmates. Because of the common security problems involved, it is not unusual for inmates confined for extreme disciplinary reasons and for inmates confined for protective custody purposes to be housed in the same unit.

It has been Fenton's observation that whenever contact visits are allowed in any penal institution contraband will inevitably be introduced into the institution. Drugs and weapons cannot be totally excluded no

matter how carefully contact visits are conducted and monitored. The administration of any prison must weigh the risks of having contraband inside the prison walls against the benefits of contact visits. Even in a maximum security prison such as TSP the presence of some contraband does not outweigh contact visits under normal circumstances. However, in Fenton's opinion, in a unit such as Vroom the dangers to human life and the risks of bodily injury resulting from contraband in the unit are so great, contact visitation should not be permitted. Even the most benevolent inmate in protective custody in Vroom might be forced by threats from other inmates to participate in a contraband smuggling venture.

Non-contact visiting at Vroom, according to Fenton, is virtually unlimited, since more time is available to inmates than is made use of. Were contact visits substituted for non-contact visits, the additional manpower required to monitor closely the visits would reduce drastically the number of such visits which could be arranged.

It was Fenton's opinion that the recreation program at Vroom is superior for a high security unit. The outdoor yard is relatively large and provides an opportunity for a good range of activities. He questioned, on security grounds, whether as many as six or eight inmates should be allowed in the yard at one time, but deferred to the judgment of the Vroom administrators that it could handle groups of that size.

Fenton viewed congregate religious services in a close custody unit as being totally inadvisable. It is indispensable to the maintenance of order in such a unit that the prison administration have absolute control over inmate gatherings. In the case of recreation, the prison officials can select who will be in the yard at the same time. Such selection is impossible in the case of religious services. There each inmate has the option to determine what religious observance he wishes to attend, and in the guise of exercising religious choice, dangerous groupings of inmates can be formed.

The general practice in units of this nature is to prohibit congregate worship services but to permit inmates to confer with ministers of their avowed faith.

In Fenton's opinion vocational training must be limited in a close custody setting. For reasons previously stated, inmates cannot be permitted to gather in groups except in tightly controlled situations, and materials used in most vocational training projects have the potential of being converted into weapons.

Fenton reviewed and gave his opinion about the other aspects of the Vroom program—the law library, meals, grievance and complaint procedures, social services, monitoring movements of inmates from one area to another, medical facilities and services. He concluded that all complied with recognized prison standards. His tour through the institution and his observation of both the inmates and corrections officers led him to conclude that the morale of both was high for such an institution. In some institutions of this nature, for example, it would have been impossible to walk through the cell blocks without protective clothing. That was not necessary in Vroom. His ultimate conclusion was that Vroom is a first-class well-run jailhouse compared to similar institutions he has seen.

E. *Changes in Response to Wooten* : It will be recalled that in addition to requiring the adoption of new procedures the *Wooten* Stipulation obligated the New Jersey Corrections authorities to use their best efforts to maintain programs of recreation, education and treatment for all inmates in Vroom and to cause the conditions of inmates confined solely for reasons of protective custody to approach as nearly as possible the conditions within the general population areas at TSP.

Defendants concede, as they must, that notwithstanding the provisions of the *Wooten* Stipulation, the lives of Vroom inmates confined for protective custody differ little from the lives of inmates confined for disciplinary reasons. The evidence compels the conclusion that if effective protection is to be accorded inmates they must be subjected

to the confining conditions which prevail in Vroom. Given the dangerous character of large numbers of the inmates in protective custody these confining conditions would be necessary even if inmates in protective custody were segregated in a unit apart from inmates undergoing disciplinary confinement. Thus, the Stipulation has failed to improve the lot of protective custody inmates vis-a-vis inmates being punished.

Attempts were made to improve the lot of all inmates in Vroom. Meal service is better, in part because of the acquisition of new equipment for heating and serving food. Although new recreational and medical programs have not been instituted, the implementation of existing programs has been improved, such as increasing the hours available for recreation. Belatedly, a law library was installed and just recently put to use. A teaching area has been constructed, located behind a partition, where small groups of inmates can receive instruction from teachers. Except for a brief period when college level courses were offered, educational programs have been limited to the secondary level on the theory that more inmates can benefit from such programs. Budget limitations prevent offering courses at higher levels. The visiting area has been renovated. To provide religious counseling, chaplaincy students, the TSP chaplain, the staff Imams and a volunteer Imam visit Vroom. A social worker has been assigned to Vroom. It was not until August, 1979 that a paralegal was assigned to Vroom on a regular three days a week basis as required by the *Wooten* Stipulation. However, prior to that time a civilian paralegal served the Vroom inmates on a five days a week basis.

A nurse is available in Vroom sixteen hours (two shifts) each day. As a result of *Wooten*, the number of days a doctor visits Vroom has been increased from every other day to five days each week. The prison authorities established an emergency evacuation system for sick or injured inmates, using a local hospital or the hospital at TSP.

A full-time social worker and a psychologist were hired. Those inmates entering Vroom were given psychological testing, and group and individual therapy were provided. Prior to *Wooten* there were no social work services and psychiatric help was available only in crisis situations or in instances of bizarre behavior.

Prior to *Wooten* visitation was permitted only during afternoons and evenings three days a week. This was increased to seven days a week during the hours of 9:00–11:00 a. m., 1:00–3:00 p. m. and 7:30–9:30 p. m. Two visitors are allowed an inmate at any one time and visits may last as long as one and one-half hours.

After the *Wooten* Stipulation was entered a Readjustment Unit Classification Committee was formed to review the status of inmates on a monthly basis and to forward recommendations for transfer to the IICC.

In summary, there have been significant improvements in over-all conditions in Vroom as a result of the *Wooten* case. With occasional lapses, the corrections authorities have made a good faith effort to comply with the *Wooten* Stipulation. The conditions of inmates confined to Vroom for protective custody reasons have improved only to the extent that the conditions of all inmates in Vroom have improved. For the most part this is necessary for security reasons—effective protective custody requires that those being protected be subjected to substantially the same regimen as is applied to severe disciplinary cases.

Vroom, like all units of the State prison system, faces severe budgetary problems. The unavailability of financial resources has forced curtailment of some of the programs at Vroom and has prevented the institution of others.

### Conclusions of Law

Three broad issues (each encompassing several subsidiary issues) present themselves: (i) May defendants hold plaintiffs indefinitely in involuntary protective custody subject to the restrictive conditions which prevail in Vroom? (ii) Have the procedures which defendants employed while

continuing plaintiffs' protective custody accorded plaintiffs procedural due process? (iii) Have defendants fulfilled the obligations which they (or their predecessors) assumed in the *Wooten* Stipulation?

■ A. *Indefinite Involuntary Protective Custody*: In a September 2, 1980 letter brief plaintiffs stated that (apart from the requirements of the *Wooten* Stipulation) they "do not contend ... that the conditions to which they are subjected are, on their face, violative of the Eighth Amendment stricture against cruel and unusual punishment". Nor could they so contend. If security or compelling administrative needs require it, inmates may be confined in segregated units having more limited privileges than those accorded inmates in the general population, *e.g., McGruder v. Phelps*, 608 F.2d 1023 (5th Cir. 1979); *Newman v. State of Ala.*, 559 F.2d 283 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). It is plaintiffs' contention that even if defendants have a legitimate fear for plaintiffs' safety, they "cannot ... over an indefinite period of time subject plaintiffs to conditions substantially more harsh than those of inmates in general population". Thus it is plaintiffs' position that even assuming there is justifiable concern for their safety in the general prison population, they may not be deprived for an unlimited period of time of the relative freedom of movement, visitation, educational and work opportunities enjoyed by the general population.

■ Unlike disciplinary cases, where an inmate is transferred to Vroom for a maximum period of time because he has violated a prison rule, plaintiffs have committed no prison offense. Except for the fact that the prison authorities believe that they could not protect plaintiffs in the general prison population, plaintiffs are no differently situated from the members of that population. It has been said, I think correctly, that "the denial to [an inmate] of benefits which other prisoners enjoy, solely because he is in need of protection from other inmates, violates the Eighth Amendment unless the disparity is justified by considerations of institutional security". *Wojtczak v. Cuyler*, 480 F.Supp. 1288 (E.D. Pa.1979) (involving an inmate who justifiably requested protective custody for fear of harm from other inmates). When determining whether the curtailment of an inmate's rights is justified, however, a court must accord great deference to correctional officials' decisions about the security needs of their institutions and ordinarily should defer to their judgment in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations. *Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–1879, 60 L.Ed.2d 447 (1979).

■ Applying these standards to the present case, I cannot hold that the conditions under which inmates are held in protective custody in Vroom constitute an exaggerated response to the need to protect those inmates.

In the first place, it must be noted that of the 130 inmates in Vroom approximately sixty are in voluntary or involuntary protective custody. These inmates must be kept separate from other inmates (including each other) and individualized programs for each of them would impose a heavy strain on available financial and personnel resources. This is in marked contrast to the situation which prevailed in *Wojtczak*, which dealt with a maximum security unit having only three inmates assigned for protective custody purposes.

Vroom's physical facilities are superior in almost every way to the facilities enjoyed by TSP's general population. It is a newer building. The cells are larger and none are inhabited by more than one inmate. There are adequate furnishings in the cells and inmates are permitted to keep generous amounts of personal possessions in the cells. Only with respect to adequate light in the cells does there seem to be justifiable complaint.

The food, medical and legal services are adequate.

The most serious complaints arise from the confinement of each inmate in his cell

for up to twenty-three hours each day and the lack of programs in which inmates can participate. Yard recreation is limited, as described above; educational programs are few; congregate worship is not allowed; only window visits are permitted; vocational training is virtually non-existent; work opportunities are minimal.

I am persuaded, however, that the security needs of the institution and the safety of persons in protective custody require that these limitations be placed on the movement and programs of Vroom's inmates. The testimony of Mr. Fenton, summarized above, and of the persons responsible for the administration of Vroom is convincing evidence that those practices are not the result of exaggerated responses to security considerations. At first glance it might appear unreasonable to subject inmates transferred to Vroom for protection from others to exactly the same restrictions as are imposed upon violent and dangerous inmates sent there as punishment for serious disciplinary infractions. However, a full evaluation of all the circumstances leads to the conclusion that similar treatment is necessary. In each case the inmate must be kept separate and apart from other inmates except in tightly controlled situations or when accompanied by prison guards. This requirement imposes very severe limits upon the kinds of activities in which either category of Vroom inmates can engage.

The conclusion that the practices employed in Vroom pass constitutional muster does not fully answer plaintiffs' contention that these practices may be permissible for a limited and defined period of time but become impermissible when imposed upon an inmate for a lengthy and indefinite period of time. However, if an inmate's need for protection persists, the prison authorities have an obligation to provide that protection. Given the limited resources available to them, confinement in a unit such as Vroom appears to be the only practical way to provide protection.

In the present case the prison authorities have not been unmindful of the oppressive effect continued confinement in Vroom has had upon plaintiffs. In an attempt to provide an alternative they have made substantial efforts to find places for plaintiffs in the general population of out-of-state prisons. The authorities of other states are not particularly anxious to receive plaintiffs and New Jersey has had to agree to take two of their inmates for each of the plaintiffs. Chavies has accepted an out-of-state transfer. Calloway and Coy have refused such a transfer, at least pending disposition of this case.

I dealt with the same situation in *Dozier v. Hilton*, 507 F.Supp. 1299 (D.N.J.1981). I stated there:

> ... Thus, for as far into the future as he can foresee, Dozier faces the prospect of being held in close confinement in conditions similar to those imposed upon inmates being punished.

> Recognizing the severity of this result and the hardship it imposes on Dozier, the correctional authorities have offered Dozier transfer to an out-of-state prison where he could join the general population. Dozier asserts that his constitutional rights are violated by putting him to this choice, for were he to accept such a transfer he would be imprisoned far from his family, preventing them from visiting him.

> The law is clear that, barring limitations imposed by state law or regulations, the Constitution does not prevent state authorities from transferring inmates from prisons in their state to prisons in another state. This may be done without hearing, without the consent of the inmate, and notwithstanding the fact that the inmate is sent to a prison at a great distance from his family and friends.

> In *Meachum v. Fano, supra* [427 U.S. 215 [96 S.Ct. 2532, 49 L.Ed.2d 451] (1976)], the Supreme Court held that 'the Due Process Clause in and of itself' does not 'protect a duly convicted prisoner against transfer from one institution to another *within the state prison system*', 427 U.S. at 225 [96 S.Ct. at 2538] (emphasis added); *see also Montanye v. Haymes,*

*supra* [427 U.S. 236 [96 S.Ct. 2543, 49 L.Ed.2d 466] (1976)].

Cases applying *Meachum* and *Montanye* have held that the power to transfer inmates from one institution to another permits transfer without hearing to prisons in other states. In *Ali v. Gibson*, 631 F.2d 1126 (3d Cir. 1980), the Court upheld a transfer from a prison in the Virgin Islands first to a penitentiary in Atlanta, Georgia, and then a penitentiary in Marion, Illinois . . .

\* \* \* \* \* \*

New Jersey has adopted procedures for out-of-state transfer of inmates. It is a party to the Interstate Corrections Compact, which is designed to permit cooperative use of facilities and programs by the Federal government and by the states which are parties to the Compact. N.J. S.A. 30:7C–1. The Department of Corrections has adopted detailed regulations implementing the Compact and setting forth standards and procedures for transferring inmates to out-of-state institutions. Standards, 868.

The regulations provide that one of the categories of inmates subject to transfer is comprised of 'those whose behavior demonstrates that they constitute an exceptional threat to the safety, security or orderly operation of any New Jersey correctional institution or those whose continued presence in a New Jersey correctional institution poses a substantial threat, for any reason, to the inmate himself'. Stds. 868(D)(2). The regulations also provide that '[a] request for a nonconsensual interstate transfer of an inmate is initiated by the institution's superintendent for any of the following reasons: protective custody; other special security requirements . . .' Stds. 868(I).

Procedures are established in the regulations for processing inmate requests for out-of-state transfer, Stds. 868(H), and for processing non-consensual transfers, a hearing being required in the latter situation, Stds. 868(I).

It is apparent that if the proper procedures were followed the New Jersey prison authorities would have the option of transferring Dozier to an out-of-state prison where he could enter the general population. If that were done his only complaint would be his far removal from his family. That complaint does not rise to constitutional dimensions.

The corrections authorities have given Dozier a choice: (i) remaining in protective custody at TSP indefinitely, or (ii) entering into the general population in an out-of-state prison. Since at least the second of these two options passes constitutional muster, requiring Dozier to make the choice is not violative of his Due Process rights.

*Id.* at 1307–09.

As in *Dozier*, I conclude that as long as the need for protective custody exists, plaintiffs' indefinite confinement in Vroom under the circumstances of this case does not deprive them of federally protected rights.

B. *Procedures Employed in This Case* : Plaintiffs further contend that the procedures which were employed when they were transferred to protective custody and which have been employed to continue them in protective custody violate their due process rights.

▇ When an inmate is subject to disciplinary proceedings and is transferred to a maximum security unit for serious misconduct, a liberty interest is implicated and he is entitled to procedures complying with constitutional due process requirements. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Similarly, when a state, by statute or regulations, specifies the reasons for which an inmate may be transferred to a maximum security unit for specified administrative reasons, such as protective custody, the inmate has a liberty interest in not being transferred for other reasons. In either situation an inmate must be accorded the minimal procedural protections prescribed in *Wolff v. McDonnell, supra*. *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976), *aff'd mem.*, 434

U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978); cf., *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). As stated by the Court of Appeals in this Circuit:

> We *do* accept as Supreme Court law the holding of *Wright* that due process protections must be afforded inmates detained in administrative confinement and that the basic procedures to be followed in such a situation are the same prescribed for disciplinary proceedings in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

*Helms v. Hewitt*, 655 F.2d 487, 499 (3d Cir. 1981).

In the present case regulations of the Department of Corrections specify the circumstances under which an inmate may be transferred to administrative segregation. In October and November, 1975 (when plaintiffs were sent to Vroom) Standards 256.210 permitted such a transfer "to aid in assuring the safety and security of the institution, for the protection of themselves or others, or because of their inability to get along in the general population". Similar regulations have been in effect since that date. They create a liberty interest not to be confined in administrative segregation such as Vroom except for such reasons. Plaintiffs, of course, have been confined in Vroom "for the protection of themselves".

In 1975 the Standards provided that any inmate placed in administrative segregation against his will for any reason was entitled to the procedures specified in Standards 254. Standards 254 provide for a hearing which complies generally with the requirements of *Wolff v. McDonnell, supra.* Thus, the Department of Corrections regulations anticipated the procedural requirements prescribed in *Wright v. Enomoto, supra,* and *Helms v. Hewitt, supra.*

█ Plaintiffs were not accorded a hearing prior to or shortly after their confinement in Vroom in the fall of 1975. I have concluded that they have no claims against defendants on this account for two reasons.

█ Under the circumstances, the initial transfer of the militant New World and Old World inmates to Vroom without prior hearing was clearly proper. Virtual civil war had erupted in TSP between the two rival Muslim factions and it was obvious that the leading members of each group had to be separated for their own safety and for the security of the institution. "When exigent circumstances within a prison warrant, an inmate may be subjected to more restrictive confinement without prior notice and hearing." *Hodges v. Klein*, 421 F.Supp. 1224, 1231 (D.N.J.1976), aff'd, 562 F.2d 276 (3d Cir. 1977); see also *Alim v. Byrne*, 521 F.Supp. 1039 (D.N.J.1980), aff'd, 672 F.2d 902, 905 (3d Cir. 1981).

If the circumstances require a transfer to administrative segregation without prior notice and hearing, a hearing must be held within a reasonable time after the transfer. *Helms v. Hewitt, supra.* In the present case, however, I conclude that plaintiffs can be deemed to have consented to confinement in protective custody at the outset and for a considerable period of time thereafter. There can be no question that there was a threat to their lives if they remained in general population. The prison records suggest that in the early years the prison authorities viewed plaintiffs' confinement in protective custody as voluntary in nature. Plaintiffs' objections to continued confinement in Vroom did not become evident until 1977.

In any event, I conclude that the *Wooten* settlement disposed of any claims plaintiffs (who were parties to the settlement) may have had with respect to the failure to provide a hearing prior to or shortly after their transfer to Vroom in the fall of 1975. The *Wooten* complaint was filed before plaintiffs' transfer out of Vroom and re-transfer back into Vroom, as described above. However, the consent order and the settlement were entered into after those events. The Stipulation permitted any individual *Wooten* plaintiff to bring only one type of claim against the prison authorities —"any personal claim he may have relating to alleged acts of brutality against him". I think a fair interpretation of the Stipulation leads to the conclusion that the plain-

tiffs in the present case abandoned any claims they might have had with respect to the failure to provide a hearing in connection with their 1975 transfer to Vroom.

In 1977 and continually thereafter until the present day plaintiffs have requested transfer out of Vroom into the general population of TSP or any other State prison. During most of that period a Vroom committee reviewed the need to continue plaintiffs in protective custody monthly and the IICC reviewed that question every three months, as required by the applicable standards and by the *Wooten* Stipulation. However, plaintiffs were never accorded a *Wolff v. McDonnell* -type hearing which met the minimum standards of notice and which provided an opportunity to be heard and to present evidence.

■ At a hearing on an order to show cause for preliminary injunctive relief held on January 30, 1980 I ruled that an inmate cannot be confined to protective custody against his will and never again have the right to contest the need for continued confinement at a full hearing. I ordered defendants to give plaintiffs such a hearing. I conclude at this time, after the trial of the case, that the preliminary ruling was correct. Failure to provide an inmate held involuntarily in protective custody for an indefinite period with a *Wolff v. McDonnell* -type hearing at reasonable intervals violates the inmate's due process rights.

■ *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975), dealt with indefinite administrative segregation for non-punitive reasons. The Court noted "that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation", at 400. Further, the Court held "that where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to population", at 400. The *Brewer* opinion, read in the light of the facts in that case, suggests that the Eighth

Circuit would have found sufficient the kind of periodic review accorded plaintiffs in this case—review by the Vroom committee and by the IICC. Since the date of that decision, however, *Wright v. Enomoto, supra*, and *Helms v. Hewitt, supra*, have been decided. Each emphasizes that an inmate transferred to administrative segregation must receive a hearing meeting *Wolff v. McDonnell* standards. Since conditions are likely to change it follows that an inmate should have the right to test the continued need for such segregation at a *Wolff v. McDonnell* -type hearing at regular intervals after his initial transfer to close confinement. Several district courts in this Circuit have so concluded, *see Drayton v. Robinson*, 519 F.Supp. 545 (M.D.Pa.1981), and cases cited therein at 551, 552. An inmate involuntarily confined in protective custody for a prolonged period is entitled to such a hearing at least once each year. Conditions might well change in a year's time, and annual hearings are not so frequent as to impose undue burdens on the prison administration. Plaintiffs in this case were not accorded such hearings even after it was clear they objected to protective custody status, and to that extent they have been deprived of due process.

Plaintiffs Calloway and Coy further contend that the procedures employed by defendants at the hearing ordered by this Court did not comport with constitutional requirements. They assert that their right to present witnesses and to cross-examine witnesses against them was unduly curtailed. They object to the hearing officer's reliance on confidential information.

On February 20, 1980 Calloway and Coy were served with notices of the protective custody hearings. The notices contained a long and rather rambling recital of events dating back to the 1960s which formed the basis for the conclusion that continued protective custody was necessary. The notices advised Calloway and Coy that they could request witnesses confined in Vroom and could submit questions to be answered by witnesses not confined in Vroom. The notices also advised that counsel-substitute could be requested.

Calloway and Coy requested thirteen witnesses from Rahway, six from TSP and seven from Vroom, setting forth five questions they wished to be answered by the TSP and Rahway witnesses. They asked for a postponement of the hearing and appointment of counsel-substitute.

The hearing officer concluded that the number of witnesses requested was unreasonable and limited the number to six. Calloway and Coy then designated three witnesses from Rahway, two from TSP and one from Vroom.

The hearing was convened on March 3, 1980. Calloway and Coy were advised that they did not qualify for representation by counsel-substitute because they had completed a high school level education.

The hearing officer reviewed the statements submitted by Calloway's and Coy's witnesses and discovered that one statement had not yet been submitted and that three statements which had been submitted were not responsive to the questions asked. The hearings were postponed in order to obtain responsive statements.

The hearings were reconvened on March 5, 1980. The inmate statements were received in evidence. In essence, they expressed the opinion that Calloway and Coy would not be in danger from other inmates if they were transferred to the general population of Rahway, Clinton, Annandale or Jamesburg. They further stated that it was unfair and unnecessary to keep Calloway and Coy in protective custody in Vroom.

Calloway and Coy each testified at his hearing, asserting that protective custody was unfair and unnecessary. Coy's request to cross-examine TSP Superintendent Hilton was denied.

The hearing officer considered the various historical documents constituting a part of the notices of hearing, and he considered the confidential documents to which reference has been made previously. His findings of fact in each case included the finding that deep-seated hostility between the Muslim sects continues to this date and that Calloway and Coy would be in jeopardy if released to the general population at TSP or any other institution. His conclusion in each case read:

Based upon the above Findings of Fact the hearing officer concludes that Inmate [Calloway] [Coy] would be in grave danger if released to general population of Trenton State Prison or any other institution. This hearing officer is of the view that while no incident has occurred between the two muslim sects recently, it is because of the separation of Inmate [Calloway] [Coy] from others, rather than peaceful co-existence of various muslim sects.

The hearing officer recommended that Calloway and Coy remain in protective custody.

On March 25, 1980 Calloway and Coy wrote to Commissioner of Corrections Fauver appealing the hearing officer's decisions. The grounds for the appeals were (i) bias on the part of the hearing officer, (ii) failure to utilize all of their witnesses, (iii) their inability to question personally their witnesses confined in Vroom, (iv) denial of counsel, (v) inability to cross-examine their accusers, (vi) reliance by the hearing officer on erroneous facts, (vii) failure to tape record the proceedings, and (viii) frustration of their attempt to put a petition in evidence. Commissioner Fauver referred the appeal to Superintendent Hilton, who advised Calloway and Coy that they would be given an opportunity to present additional evidence. Each was requested to submit a list of additional witnesses and to specify the information each witness was expected to provide. Instead of naming additional witnesses Calloway and Coy submitted a series of questions to be answered by Superintendent Hilton. After Calloway and Coy failed to meet a deadline for providing the names of additional witnesses, the hearing officer confirmed his original decisions.

█ The hearings which were given to Calloway and Coy complied both with the requirements of *Wolff v. McDonnell, supra,* and of New Jersey's prison regulations, Standards 254.

It was not necessary to appoint counsel-substitute. Calloway and Coy are articulate, intelligent and educated persons. Each was well able to present his position at his hearing. In those circumstances neither *Wolff* nor the applicable regulation (Standards 254.17) require counsel-substitute.

There is no evidence that the hearing officer was biased. There is no constitutional nor regulatory requirement that hearings be tape recorded. At the initial hearings Calloway and Coy had an opportunity to put a petition on the record and did not avail themselves of the opportunity.

Under both *Wolff* and the New Jersey regulations (Standards 254.17, 254.18 and 254.19) the right of cross-examination may be limited in the interests of institutional security, and the number of inmate witnesses and the form of their testimony may similarly be limited. The limitations imposed in this case were reasonable.

■ If the disclosure of confidential documents would impair the ability of prison authorities to maintain control over potentially violent groups and would jeopardize the safety of informants, they need not be disclosed. *Jabara v. Kelley*, 75 F.R.D. 475 (E.D.Mich.S.D.1977). The recent Third Circuit case of *Helms v. Hewitt, supra,* however, imposed limits upon the use of statements of undisclosed informants. There, the plaintiff was convicted of striking a prison sergeant. The only evidence offered against him was the testimony of a lieutenant, who testified as to a notarized statement which an informant had given to him. The hearing committee did not know the identity of the informant and had not interviewed him, and there was no evidence of the reliability of the unknown informant. The Court held that this evidence was insufficient to support the determination of the hearing committee, stating:

> We therefore hold that when a prison tribunal's determination is derived from an unidentified informant, the procedures approved in *Gomes v. Travisono* [510 F.2d 537] must be followed to provide minimum due process.

> (1) [T]he record must contain some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement. 510 F.2d at 540.

Thus, Helms suffered a denial of due process by being convicted on a misconduct charge when the only evidence offered against him was a hearsay recital, by the charging officer, of an uncorroborated report of an unidentified informant.

There are very substantial differences between *Helms* and the present case. Helms had been charged with a discrete infraction of prison rules. In the present case, on the other hand, plaintiffs were not charged with an offense; rather, the prison authorities had assembled a substantial amount of information during the course of a number of years in order to enable them to exercise their discretion whether to release plaintiffs from protective custody. The nature of the proceedings was very different.

Further, in addition to the use of confidential information (which included reports of unidentified informants) there was a substantial body of other data against which the reports of the informants could be evaluated. In the circumstances of the present case it was not improper for the hearing officer to rely on the confidential information and to maintain its confidentiality.

■ As to the merits of the hearing officer's decision, two points must be made. First, the prison authorities were not making a factual determination of guilt or innocence on a disciplinary charge. They were acting in an area where judgment and discretion had to be exercised. A court should rarely interfere in the exercise of such discretion. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Secondly,

as to a hearing officer's factual findings, it is not for a court to weigh the evidence and make findings on the merits of the proceeding. The court's function is more limited. It must determine if there was substantial evidence to support the hearing officer's conclusion. If there was such evidence, the hearing officer's determination should not be disturbed. In the present case, having examined the record before the hearing officer, I conclude that there was substantial evidence to support his conclusion.

It is true that at the trial of this case, over defendants' objections, I permitted plaintiffs to call as witnesses Raymond Dozier, Keith Allen Hill and Richard Lawton, each of whom is serving a life sentence at Rahway for participation in the murder of Minister Shabazz. Each testified that he knows the various Muslim groups and leaders at Rahway and that plaintiffs' entry into the general population there posed no threat to plaintiffs or to the security of the institution. This testimony was not admissible for the purpose of showing that the hearing officer's determination was not based upon substantial evidence. That was a question which could be decided only on the basis of the record before the hearing officer.

I conclude, therefore, (i) that the procedures which were employed at the March, 1980 hearings were consistent with due process requirements, (ii) that the decision to continue Calloway and Coy in protective custody was a proper exercise of discretion, and (iii) the factual findings upon the basis of which the discretion was exercised were supported by substantial evidence.

■ C. *Compliance with Wooten Stipulation*: Plaintiffs charge that defendants have not complied with the obligations assumed by the State in the *Wooten* Stipulation. The portions of the Stipulation pertinent to this case are paragraphs 3 through 6, which deal with periodic review of the status of Vroom inmates, paragraphs 7 and 8, which deal with Vroom programs and facilities, and paragraph 9, which deals with legal assistance.

I conclude that with the exception of the requirement of a report to the Division Director (the Commissioner) on inmates confined in Vroom for more than one year, there has been substantial compliance with the procedures mandated for the review of the status of Vroom inmates. There has been a monthly review of each inmate by Vroom administrative personnel. The IICC has conducted a review of each inmate at three-month intervals after the first six months of confinement in Vroom. There is no evidence that plaintiffs are being kept in Vroom because the superintendent of no other State penal facility is desirous of having them sent to his institution, *cf. Dozier v. Hilton, supra.* (*See* Exhibits P47, P48, P49, P50, P51, P52 and P55 for evidence of lapses in the observance of the *Wooten* Stipulation and for evidence of attempts to comply.)

It was not until August, 1979 that there was full compliance with the requirement of paragraph 9 of the Stipulation that at least one member of the Inmate Legal Association at TSP visit Vroom at least three times a week for the purpose of rendering legal assistance to the inmates. A civilian paralegal provided these services before that date. There is nothing in the record showing whether the quality of legal services was better or worse prior to August, 1979. In any event, plaintiffs do not appear to have been injured in any way by this failure to comply with the Stipulation. Recently the State has gone beyond the *Wooten* requirements and has installed a law library in Vroom.

Paragraph 7 of the Stipulation provides that the "defendants shall use their best efforts to maintain regular programs of recreation and treatment for all inmates in the Readjustment Unit, and to maintain the facility in a healthful and sanitary condition". Except for the failure to provide light bulbs of sufficient strength for the cells, Vroom has been maintained in a healthful and sanitary condition. The decree to be entered in this case will require that the Director of Vroom shall provide a 100-watt electric light bulb to each plaintiff still in Vroom who requests it. The recrea-

tion, education and treatment programs maintained for Vroom inmates are described in the Findings of Fact. The efforts to improve these programs after entry of the *Wooten* Stipulation are also described. Given the limitations imposed by security considerations and practical constraints imposed by budgetary and manpower factors, I conclude that the prison authorities have used their best efforts to maintain regular programs of recreation, education and treatment of all Vroom inmates generally.

Paragraph 8 of the Stipulation relates specifically to inmates transferred to Vroom solely for reasons of protective custody. Such inmates "shall be confined under conditions which approach as nearly as is reasonably possible in the Unit, the conditions within the general population areas at Trenton State Prison". In determining what is "reasonably possible" there shall be "due regard for the nature of the Unit's physical plant, for security considerations, for the special precautions which the maintenance of a protective custody unit requires, and for the Division's manpower and budgetary limitations".

If the various factors which may be considered in determining what is "reasonably possible" are taken into account, and if one considers that approximately eighty of the Vroom inmates are in protective custody, one must conclude that it is not reasonably possible to create conditions for protective custody inmates which differ significantly from conditions of the other Vroom inmates. As long as there are a substantial number of inmates in protective custody it will not be reasonably possible to confine them under conditions which approximate to any significant degree the conditions enjoyed by the general population at TSP. The reasons for this are spelled out in more detail in Part E of the Findings of Fact above.

However, plaintiffs are a smaller subgroup within the larger group of inmates held in Vroom for protective custody reasons. Perhaps one other inmate beside themselves has been held in involuntary protective custody since 1975 with no prospect of release to the general population. As to such limited number it is reasonably possible to confine them under conditions which more nearly approximate conditions within the general population areas at TSP. With due regard to Vroom's physical plant, security considerations, the special precautions which the maintenance of a protective custody unit require and the Department's manpower and budgetary limitations, it is reasonably possible to provide this smaller number of inmates with occasional contact visits and with educational opportunities suitable to their intellectual level. Construing the *Wooten* Stipulation in the light of the circumstances of this case, I conclude that it requires that plaintiffs be given the opportunity to have contact visits no less frequently than once each month and that plaintiffs be given the opportunity to take correspondence or other courses at such secondary or post-secondary level as they are capable of handling. A provision to this effect will be included in the decree disposing of this case.

D. *Damages*: Plaintiffs have prevailed upon certain of the contentions which they raised in this action. They have established that they have been deprived of their constitutional right to a periodic hearing meeting *Wolff v. McDonnell* standards in which they could contest their continued confinement in protective custody. They have established that the *Wooten* Stipulation is being violated in certain respects—by the failure of the prison authorities to provide Vroom inmates with adequate cell lighting, by the failure to allow plaintiffs a limited number of contact visits, and by the failure to provide plaintiffs with appropriate educational programs. Plaintiffs are entitled to injunctive relief. They also seek damages against the defendants. Defendants assert the defense of official immunity.

The United States Supreme Court redefined the scope of this defense in *Harlow v. Fitzgerald*, —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

We therefore hold that government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at ——, 102 S.Ct. at 2738.

In *Harlow* the Court eliminated the subjective element of an official's qualified immunity defense as previously defined in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Although *Harlow* dealt with a claim against federal officials, the Court noted that the immunity rule which it adopted would be applicable in § 1983 suits brought against state officials:

> This case involves no issue concerning the elements of the immunity available to state officials sued for constitutional violations under § 1983. We have found previously, however, that 'it would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.' *Butz v. Economous*, 438 U.S. [478], at 504 [98 S.Ct. 2894, 2909, 57 L.Ed.2d 895].

*Id.*, at ——, 102 S.Ct., at 2738–39, n.30.

■ Applying the *Harlow* rule, it is apparent that each of the defendants is entitled to rely upon the defense of a qualified immunity. The conduct of none of them violated clearly established statutory or constitutional rights of which a reasonable person would have known. The constitutional right which I found to have been violated in this case is the right of a person confined involuntarily in protective custody to an annual hearing complying with *Wolff v. McDonnell* standards to enable him to contest the continued need for protective custody. This was not a clearly established constitutional right during the periods relevant to this case.

It was not until 1978 that the Supreme Court ruled that due process protections must be accorded inmates who are transferred, for administrative purposes, from the general prison population to a maximum security unit. *Wright v. Enomoto, supra.* That was three years after plaintiffs were transferred to Vroom. The Supreme Court has not yet been presented with the question raised in this case, namely, whether an inmate held involuntarily in long-term protective custody is entitled to periodic hearings so that he can contest the continued need for such confinement. Similarly, in *Helms v. Hewitt, supra*, the Third Circuit addressed the question of what process was due at or near the time of transfer to a maximum security unit for administrative reasons, but it was not required to address the question of periodic hearings in long-term protective custody situations. I know of only one circuit court case which considered the necessity for periodic review in cases involving indefinite administrative segregation for non-punitive reasons. *Kelley v. Brewer, supra.* There the Eighth Circuit held that in such a situation the inmate's status must be reviewed periodically in a meaningful way, but the opinion does not suggest that the kind of review must be a hearing meeting *Wolff v. McDonnell* standards. In fact, the kinds of periodic reviews which defendants accorded plaintiffs in this case might well have met the requirements of *Kelley v. Brewer.* I do not believe that relatively recent district court cases in other districts such as *Drayton v. Robinson, supra*, can be said to create clearly established constitutional rights which would strip defendants of their qualified immunity. Even if those decisions were to create such rights, it would be unreasonable to charge defendants with knowledge of them.

Further, defendants' review procedures were in general conformity with the procedures required by paragraphs 3 through 6 of the *Wooten* Stipulation, a stipulation approved by an order of this Court. The law in this area has been evolving since the Supreme Court decided *Wolff v. McDonnell* in 1974, expanding and defining the rights of inmates to due process hearings. Although I believe the Supreme Court and Third Circuit cases point to the conclusion I have reached in this case, and which other district judges have reached in analogous cases, it would not be reasonable to require that defendants anticipate this result under penalty of damages for failure to do so.

I interpreted the *Wooten* Stipulation to require that persons such as plaintiffs, a very small proportion of the inmates in protective custody, be given an opportunity for occasional contact visits and an opportunity to take educational courses suitable to their intellectual attainments. It was not necessary for me to determine when plaintiffs' right to these programs first arose or how long an inmate had to have been confined in protective custody before he attained such rights. That would depend in good measure on how many other inmates were in the same situation. Contact visits and special educational courses would be reasonably possible (and therefore required under paragraph 8 of the Stipulation) only if a very small number of inmates were entitled to them. There are few inmates who have been confined in involuntary protective custody since 1975, and therefore it is reasonably possible to provide some programs for them similar to those enjoyed by the general population at TSP. I reached no conclusions as to whether it is reasonably possible to provide these programs to inmates confined in involuntary protective custody since 1976, or 1977, or 1978, etc. That question is not before me.

Defendants interpreted and applied paragraph 8 of the *Wooten* Stipulation differently. They interpreted it to require that all inmates in protective custody be treated alike. Under that interpretation it would not be reasonably possible to provide them with contact visits and special educational courses, because the numbers involved would create serious security and budgetary problems. This was not an unreasonable interpretation of the agreement, and my interpretation was certainly not so clearly established that a reasonable person should have anticipated it. Consequently, defendants cannot be held liable for damages for failure to provide plaintiffs with contact visits and educational courses.

█ Defendant Tard, Director of Vroom, knew that the light in plaintiffs' cells was inadequate and failed to take readily available steps to ameliorate the situation. I found that this constituted a violation of paragraph 7 of the *Wooten* Stipulation. Irving Birney, M.D., an ophthalmologist who testified on behalf of Calloway and Coy, stated that each showed signs of eye strain which, in his opinion, was due to poor lighting over the years. Each had 20/30 vision correctable to 20/20. Plaintiffs have not established by a preponderance of the evidence that the lighting conditions in their cells have caused them permanent eye injury. No damages will be awarded for the failure to supply 100-watt light bulbs.

### Conclusion

Except as noted above, defendants have prevailed in substantial measure in this case. However, in view of the fact that plaintiffs have prevailed on some issues and in view of the fact that they have proceeded *in forma pauperis*, no costs will be allowed to any party. I will enter an appropriate judgment.

### FINAL JUDGMENT

Plaintiffs, Lamont Calloway, James Coy and Albert Chavies, instituted this action against defendants William H. Fauver, Gary J. Hilton, Elijah Tard, Jr., and Joseph G. Call charging that their confinement in protective custody since 1975 and the conditions of their confinement violated their constitutional rights and that defendants have violated the provisions of the Stipulation of Settlement entered in *Wooten v. Klein*, Civil Action No. 75–179. The case was tried without a jury and the Court has set forth its findings of fact and conclusions of law in a written opinion filed this date.

For the reasons set forth in the opinion IT IS, this Second day of August, 1982, ORDERED that final judgment be entered as follows:

1. As long as plaintiffs are confined involuntarily in protective custody in a maximum security unit of the New Jersey prison system they shall be given at least once each year a hearing meeting the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), at which they can contest the need to retain them in protective custody.

2. The Director of the Vroom Readjustment Unit shall, upon the request of a plaintiff housed in Vroom, furnish such plaintiff a 100-watt electric light bulb to illuminate his cell.

3. Each plaintiff confined involuntarily in protective custody in a maximum security unit in the New Jersey prison system shall, in addition to normal visitation in such unit, be permitted a contact visit at least once each month and shall be provided on a continuing basis with the opportunity to take correspondence or other courses at such secondary or post-secondary level as is appropriate to his educational and intellectual attainments.

4. Plaintiffs' demand for damages is denied.

5. Except to the extent provided for herein, plaintiffs' other claims for relief are denied.

6. No costs shall be allowed to any party.